114480 and 1047, Petition for Enforcement and Petition for Review, I think. Ready to proceed? Had you said no, that would have been music to my ears. But I assume your silence means that you're ready. I'm going to ask one of my partners, but to no avail. Good morning, Rob. Morning. Give me one minute. Mr. Howard, your name. Shut up. Good morning, may it please the court. My name is Mark Belland. I represent Petitioner Sheet Metal Workers International Association Local 27 in this matter. I would respectfully like to reserve 10 minutes for rebuttal. All right. The issue before the court today is whether the preemptive scope of the National Labor Relations Board's Section 10-K enforcement process renders a voluntary jurisdictional dispute resolution mechanism embodied in a state-authorized project labor agreement and Petitioner's claim for damages invalid. We believe it should not. The history of the Acre Harbor Township project, briefly, is as follows. If you can do that briefly, you're good. Yeah. This has been going on since 2007, so it has a long, long history. We know the history. We think we know the history. I'll recite it just briefly to try to set the predicate for the positions that we have taken throughout the litigation, the position that we wish the court to entertain today. February of 2007, Acre Harbor Township, a municipal entity under the laws of New Jersey, adopts a project labor agreement consistent with the New Jersey project labor agreement statute, NJSA 52, Column 38-1 at SEC. The reasons for adoption of the project labor agreement are spelled out in the agreement itself, which is Joint Appendix 92, and that is for purposes of economy, efficiency. Maybe I can help shorten this a little bit, right? Maybe you can help me understand this. Why doesn't Cary basically mean that you lose? You're arguing that you're not suing for money for lost wages. You're suing for damages for breach of contract, the measure of which is the amount of the lost wages. Why doesn't Cary basically say that you lose? There's two reasons. The first is we believe the labor board should not have exercised jurisdiction to have a 10-K hearing, and the reason for that is in the project labor agreement, there's a voluntary dispute. They didn't sign the project labor agreement. In that analysis, Your Honor, you're right. Carpenters didn't technically sign the document. From our way of looking at it, it's really a superficial determination. Yes, they didn't sign the document, but a review of the state statute and a review of the project labor agreement leads to the conclusion that in order for the statute to work properly, in order for the intent, particularly of the governing authority, Egg Harbor Township, to have labor peace and for the whole project labor agreement process to work, simply put, anybody working, any party, contractor, union organization, union entity, working on that project must be bound. The contract is the PLA. And you're right. Directly, does the PLA say that it finds a non-union signatory? No. We don't find that language directly in the PLA. What principle of contract law would allow you to extend principles? I don't know whether it would be an inferred contract, I guess is what you're arguing, but an implied contract. What principle of contract law would allow you to extend a mechanism which is born and tied tightly to the assent of the parties, the obligation to arbitrate? Take that obligation and extend it to someone who is not a signatory to a contract or doesn't have some other nexus to a party that is that would justify finding an implicit contract. That's a good point. But the nexus is, quite simply, the carpenters' union and its members as employees of Donnelly receive the benefit of the project labor agreement by working on and receiving wages and benefits on this particular project. I don't know, if you're arguing quantum merit for wages, maybe that would go down that road. But you're arguing something, a dispute mechanism. Is there any case that would help you with that, that would look at a contract law the way you're trying to get us to look at contract law? I don't think there's a case that decides it one way or the other from our research and analysis as to whether a union must actually physically sign the project labor agreement to be bound to the dispute resolution mechanism. The way we analyze it, Your Honor, is it's a matter of contract interpretation. It's a matter of what did the parties intend. When you say parties, it doesn't help because they're not parties. Okay, so let's start with the intent of the parties. Let's start with the intent of the governing authority, Egg Harbor Township as a municipality. Clearly, the intent of Egg Harbor Township as testified to by their business administrator, Peter Miller, and in communications. The intent of the municipality was that this project labor agreement was to govern the project. And the policy considerations for that and the policy considerations underwriting the state statute are that you have a project labor agreement to make sure there's harmony and to make sure that what happened here doesn't happen, that there's no picketing, there's no threats of picketing, there's no labor unrest, that there's a peaceful dispute resolution mechanism. So that's the intent of the township as one party to this agreement. The township could have done that by having the business manager for 623 sign a letter of assent. In some way, Donnelly signed a letter of assent. The same letter of assent could have been signed by the appropriate officer of the union. That's one option, one option. It seems to us, and I think this is consistent with the district court's rationale throughout this case on the 10-hour injunction on the motions for summary judgment. All entities had a business decision to make, whether it's Donnelly as a subcontractor, whether it's the carpenters' union as an entity. Do they want to enter into a relationship that benefits them by working on this particular project? And if so, they can't benefit from working on the project without undertaking reasonable obligations. Well, they're going to say it's not reasonable to require them to follow the terms of an obligation they never agreed to, to follow an arbitration provision they never agreed to or saw. No, and I understand that position. We don't agree with it. I don't believe that the technical issue of signing the PLA should allow the carpenters as an organization to benefit from working on this project and not have any obligations associated with it. Why wasn't their obligation just to do the work? The detriment to them is we do the work. The benefit is we get paid. And if that violated some agreement that somebody else had with somebody else, that should be the problem of those other parties, not the carpenters. Why is it not that simple? Well, it's not that simple because, number one, it's a project labor agreement, and I think there are significant policy considerations. But how do you bring them into that agreement? How do you make them suffer the detriment of that agreement in light of what Chief Judge McKee was asking? It's a good point, number one, interpretation of the agreement, and number two, that just utilizing, and we briefed this, equitable principles. They worked on this project. And you're right. Could it be as simple as they worked on the project, they received wages and benefits at the end of the analysis? It's one way of looking at it. We think the better way to look at it, and consistent with New Jersey state law and the legislative policy considerations for the project labor agreement statute, lead to a different conclusion, and that is there's an expectation by any party, any entity, any organization, which undertakes to work on a project which is governed by a project labor agreement, that there's obligations beyond just doing the work and being benefited by pay and benefits. Why wouldn't their expectation be that Donnelly may have gotten itself in a bind and it's going to have to figure out how to deal with it? It's not our problem, it's Donnelly's problem. And that's one of the expectations. But I think you also have to look at it from an equitable standpoint, in terms of fundamental fairness. The rationale, the significant policy consideration for having a project labor agreement, is to have a mechanism to resolve fights between labor organizations and to resolve jurisdictional disputes. Doesn't the NORA provide a mechanism for resolving these jurisdictional-type disputes as well, especially where you have one party that's not bound by that dispute resolution mechanism? And it's the 10-K process, which is a competing process. But what we're dealing with here, Your Honor, is project labor agreement. But is it competing? Because you don't get to the 10-K process. One of the things the board has defined is that there's no alternative mechanism for the two parties sitting down and settling the jurisdictional disputes. And that's our threshold argument, is that it was not necessary for the labor board to intervene because the project labor agreement statute mandates that there be a voluntary dispute resolution process. A corporate township followed it by adopting a PLA with that provision. Well, maybe that's the answer to your question. You could have a statute which doesn't look to a PLA agreement to get the arbitration, but just put in the statute that anybody who undertakes a municipal contract thereby agrees to submit any contract dispute or any jurisdictional dispute for arbitration. If you put it in the statute, it's no longer a matter of contract. Then you get an implied contract to get arbitration when they take the job. But that wasn't done here. Well, not directly. We believe a fair reading of the state statute. Does it specify that a union not working on the project is bound by it? No. Does it use that language? It does not. But a fair reading of the language in the statute consistent with the underlying policy to have project labor agreement projects. What language in the statute are you referring to? Where do you get that reading? If you look at the statute, the legislative findings under 5238-1, subsection F, project labor agreements also make it possible to provide for peaceful, orderly, and mutually binding procedures for resolving labor issues. It continues under subsection... It says that public entities may include a PLA in a public works project. Yeah, under 52-38-3. The benefits of doing it under 5, it says it's binding on all contractors and subcontractors working on the public works project, but it limits the obligation that you're trying to get to the union. It limits that obligation to contractors and subcontractors. They could have gone further. Maybe politically they couldn't have gotten it done that way, but they could have gone further under 5238-5 and said a PLA is binding on all contractors, subcontractors, and unions or workers engaged in public works projects or contracted to work in public works contracts. That gives you the nexus that you're looking for, but that's not... Right, and it doesn't specify it, but it continues. The decision by the public entity to require inclusion of a project labor agreement requirement shall not be deemed to unduly restrict competition if the public entity finds that the project labor agreement is reasonably related to the satisfactory performance and completion of the public works project and any bidder for the public works project refusing to agree to abide by the conditions of the project labor agreement or requirement to negotiate shall not be regarded as a responsible bidder. Right. So... Contractor and subcontractor. You're right, Your Honor. That's the language that's used, but in order for this statute, in order for the project labor agreement statute to work, you cannot have a project where you have five unions signed on to the project labor agreements doing the majority of the work and one union or two unions not signing on to the project labor agreement. It defeats the entire purpose of having a project labor agreement. You don't end up with harmonious labor relations. If you look at the project labor agreement in this case, it deals with all sorts of working conditions, wages, benefits, scheduling, flexibility of hours, apprentices, holidays, a host of garden variety working conditions, as well as the voluntary dispute resolution mechanism, all of which goes out the window. You've identified a valid, it seems to me, real world problem, but whose fault is that? If the PLA is defective because it did not encompass all the necessary unions for the very reasons you just described, isn't that the fault of the signatories to the PLA? Well, the folks at JAFTA, whatever. And that's one way to look at it. We feel... I mean, they brought in the Trades Council. They did. They knew the carpenters weren't part of the Trades Council. They did. Why didn't they say, well, we better bring in the carpenters too, and every other union we can find that's not a member of the Trades Council that might be a union that's going to be asked to do work on it? It actually seems like 40% of the work on this project was carpentry work. 60% or 40%, a big chunk of the work was carpentry work. It was a significant part of the work. The majority of the work was done by the signatory unions. I think the answer is, and I understand your point, and it's a good point, Your Honor. I don't think, no matter what was going to be done here, carpenters weren't going to sign this agreement. We have a view of the facts of this case, and I think the district court had a view of the facts of this case, that the 10-K process was kind of engineered by the carpenters' union and a contractor that it had a longstanding relationship with. By technically not signing the project labor agreement, it allowed the carpenters and Donnelly to access the 10-K process. And the 10-K process, Your Honor, is a mechanism to resolve workplace disputes. The issue, however, is if you canvass the 10-K decisions, which have been issued over any time period, they're all based on employer preference. Well, that's true, but there's still… It's the process. And if the signatories to the PLA didn't like that, they shouldn't have hired Donnelly. Surely they knew what was coming down the pike if they hired Donnelly, again, for the reasons you just described. Well, and I think that goes to Sandi's conduct. Donnelly was hired on, signed a letter of assent, saying that not only for itself, but its employees, were complying with the dictates of the project labor agreement and certified. They may have the answer for their failure to comply with that, right? We're certainly trying to have an answer for it, yes. But I think you've got to take a look at the big picture, the policy considerations of the statute, the reason for the project labor agreement. And there was a reason why the Carpenters Union didn't technically sign this document. They wanted to invoke the 10-K process because it's employer preference. And there's even a letter from… That doesn't make a whole lot of sense to me. I'm sorry to interrupt you. Sure. I mean, if they had signed the PLA, what would have precluded Donnelly from giving the work to the Carpenters Union then? They were a signatory. Okay, they could have. And let's follow that. That's a very good question. Let's follow that process. If they had assigned it to the carpenters, Local 27, the sheet metal workers, as we did, access the jurisdictional dispute resolution mechanism by filing a grievance, an arbitration hearing is convened. There's no 10-K process. The carpenters didn't like that arbitrator. They didn't like the arbitrator. They also didn't like… I can assume nobody in this case likes anybody on the other side of it. Right. Except maybe the NLRB, which really doesn't seem to give a darn. And didn't like the area practice language in this jurisdictional clause on the award of work. And the work would have been awarded to the sheet metal workers. But, you know, our view is that you can't have it both ways. You can't work and have all the benefits and not have the obligations, number one. I think I'm out of time. You've been out of time for quite a while, but no one's jumping on your throat or cutting you off. You mentioned… You made it sound like you may well be right, because this is one of the cases that we see, at least in my mind, that it's the iceberg, that no matter what you see through the hoods of it, it's down below it, and I'm not saying it. I'm not sure it's even on the record, but there's clearly a lot more going on here than is coming forth in the briefs. And I don't want to get into any of that either. But you mentioned that 623 kind of manufactured a 10-K proceeding. But in order to resort to the 10-K proceeding, there had to be a finding, and it's not being challenged, that there was a legitimate – the ULP proceeding, not the 10-K proceeding – that there was a coercive act on the part of someone to get to the end for labor practice. Both unions are engaged in an end for labor practice, coercing the employer. How did you get to the point of one union manufacturing the 10-K proceeding? Well, Local 27 didn't take any coercive action – no threat to picket, no picketing, simply a grievance under the jurisdictional dispute resolution. That they were going to resort to the arbitrator following the jurisdictional dispute. They didn't get the work. The unfair labor practice charge against the sheet metal workers, leading to the 10-K process, was dismissed by the Labor Board. Yes, there's a letter from the carpenter to Donnelly saying, we understand Local 27 has made a claim for the work. If you give the work, we're going to picket. Yes, there's that letter. Now, what are the bona fides of that letter? You've got to put it all in kind of temporal context. Donnelly signs a letter of assent. All that happens in the month of April, signs a letter of assent, immediately assigns the work to the carpenter, not undertaking any investigation as to whether the carpenter signed to the PLA, what the PLA obligations are. We've heard, you know, in this litigation, every excuse for the letter of assent from the owner of the company, was legally blind, never read the PLA, never made any inquiry, believed it only meant it had to be a union project. Everything's been thrown against the wall. So the assignment's made. Local 27 files its grievance. Within a matter of days, there's a threat to picket by the carpenter, a threat to picket. And then immediately the 10-K process starts. The Labor Board gets involved. The charge against Local 27 is dismissed. It's dismissed. And in the real world, day-to-day stuff that us labor lawyers deal with every day, the only way to get to the 10-K process was for the carpenter to say, you know what, technically we're not signed to this document. We're going to get all the benefits, all the privileges of working on this project. We get the work. We get 30% of the work. It takes care of our members that are unemployed. They all get to go work on this project. But you know what? We don't like Stanley Aegis as an arbitrator. We don't like area practice. There's only one arbitrator we like in these PLAs, J.J. Pearson. So we're going to the Labor Board. Because why? It's employer preference. That may all be true, but how does that change anything in terms of the legal outcome? Well, I think you've got to look at it, all of these facts, and there's lots of moving parts here. From the analysis of the statute and the policy considerations, the reason why Egg Harbor Township adopted this project labor agreement, probably regretting it now, but there's a rationale for it. And the factual scenario, Your Honor, that I just laid out is part and parcel of it, and why there should be a conclusion. I think that's probably true, but Egg Harbor's intent can't impose or impress a contract on a third party. They may have had that intent. 623 didn't participate in the arbitration with Aegis. They've been crazy, given their stance, to go into that arbitration. The minute they do, they've got an implied contract. They were certainly invited. None of this was done behind closed doors. They were invited to participate. They would have called that invitation a sucker punch, probably. An offer they can't refuse? Why would they accept that invitation? I think I've laid out what our position is. I understand the comments. The second argument here is even if the voluntary dispute resolution mechanism wasn't binding on the Carpenters, we believe it was, and the Board had the right to convene a 10-K hearing to determine the assignment of work. We believe that our claim for damages should still be allowed to proceed. And there's a couple different reasons for that. Number one, the 10-K award itself, which was issued, I think, the last day of December in 2007, expressly, from our standpoint and from the district court's standpoint, permitted a claim for damages. I don't know what that language means. It seems to me that we're bound by the language of Kerry. I looked at that language in the NLRB's decision talking about the right to proceed in contract. I'm not at all sure what that means, especially against the background of Kerry. It's a 1964 Supreme Court case. But at least speaking only for myself, I can't get past Kerry's pronouncement that a suit for damages in a situation like this is the same as a suit for lost wages. And it makes perfect sense because the measure of damages are going to be the wages. And we don't disagree with that proposition. It's a 1964 case. We're dealing with a different situation that is probative, and that is it's a project labor agreement, creature of state law. You want to pay basically a PLA exception to the doctrine of Kerry. Yes, and the rationale is it's a nonpreempted arena, Boston Harbor and its progeny. There's significant policy considerations for having project labor agreements, for all the reasons I've articulated. And the intent of the parties, again, is to have labor peace, a mechanism to resolve. Why would the PLA be any different? Let's assume that a huge shopping mall developer, same situation, wants to have a situation where all of its contractors, subcontractors and unions sign on to an arbitration agreement. My guess is it happens all the time. Why should the agreement that is drafted, let's take the exact language of the PLA, strike out the municipality language or plain private party language or mortgagee language? You get the same agreement, exactly the same interest, you want labor peace, you want a mechanism which is going to minimize the possibility of picketing and strikes, force jurisdictional disputes into arbitration. Why would a PLA be any different? I don't know that it would. You're asking for a PLA exception. Well, right, but I think what you're describing sounds to me like a PLA, where you have multiple unions signed on to one document and you have all of those policy considerations that you have a project that is governed under one set of rules and one agreement, which makes it fundamentally different. And the district court kind of went through this in a lengthy analysis. From the garden variety 10-K process, where you have a contractor, one contractor on a project that may have two collective bargaining agreements, two collective bargaining agreements that have existed for many years and kind of unintentionally ends up in the middle of a conflict. That's what the 10-K process is meant to resolve. And particularly the insulation which a contractor receives by having the labor board decide which way to go. The district court said, you know, that's fundamentally different from the facts of this situation. Here you have, number one, a project labor agreement for all the policy considerations, but you have a contractor that's had a longstanding relationship with Local 623, the carpenters' union, just kind of blindly walking in, signing this project labor agreement in a very powerful letter of assent, certifying. I can comply with all of the obligations in this PLA. I don't have any commitments to the contrary. It fines me and it fines my employees and anybody else I do business with on this project. That is fundamentally flawed. And I think that, in all honesty, is really what got to the district court and led to the rationale. And the district court was very clear that it wasn't really happy with the contracted employer. So in terms of distinguishing this case from the garden variety 10-K case where contractors, yes, and I understand it and rightfully so, you know, from a prophylactic standpoint, have the benefit of 10-K absolution. That is fundamentally different from the scenario in this case. We are not here saying the labor board doesn't have jurisdiction in the 10-K world. We are not trying to supplant their jurisdiction. What we are saying is in a very narrow area, in a project labor agreement context, for all of the policy considerations that we indicated, that if you allow what happened here for one party to not technically sign access to 10-K process, as the district court said, you will eviscerate, strong word, eviscerate project labor agreement and undermine the statute. We are looking for a sliver of an exception in the project labor agreement world. Thank you, Mr. O'Brien. You did reserve quite a bit of time. Thank you. Mr. Beard? You having fun yet, Ms. Beard? Quite. Okay. Thank you, and may it please the court. My name is Heather Beard, and I represent the National Labor Relations Board in this matter, and we are seeking enforcement of our order in full against sheet metal Local 27. How common would you call it a PLA or just a preliminary hiring agreement, the generic term? I would imagine this kind of agreement is very common on very large projects. The reason I ask, and Mr. Bellin is asking for a very narrow exception in the case of PLA, and my guess is that exception would eat up the commercial construction industry. Correct, Your Honor. In fact, the board on page 3 of its decision in order in the unfair labor practice case, in a footnote, did take on directly the exact argument that you were speaking with my opposing counsel about and cited a case, a FOSTE case, which is a longstanding board decision that treats a PLA on the same footing as a collective bargaining agreement under the rationale that the board reasonably adhered to, which is that a PLA is nothing more than a pre-hire agreement between parties that has attached to it, perhaps, as in this case, other collective bargaining agreements that are incorporated into it. And the argument that there should be a PLA exception was not only considered by the board and rejected by the board, but I think it's important to point out here that the standard of review in this particular case for enforcement of the board's order is whether the board acted arbitrarily or capriciously in making these findings, and it's illustrated by the, I believe, some of the discussion that you were having right now, that the board's view here, not only that it was not creating a PLA exception and there isn't one, but that also it had the jurisdiction in this 10-K proceeding to go forward because the parties didn't demonstrate a voluntary dispute mechanism that everyone was attached to. That's another standard of review here that the board determined, and that the Local 27 has failed to demonstrate that the board acted arbitrarily in its interpretation, that there wasn't a voluntary dispute mechanism. Well, what remedy, then, does Local 27 have against Donnelly? Donnelly clearly blew it. They signed this agreement saying that they didn't know of anything out there that would prevent them from signing this agreement. By the time they did that, they knew they had this longstanding legal obligation to 623, and they had to know they were going to bring 623 into a job that, under the PLA, should have gone to, let me rephrase that, under the PLA may well have gone to Local 27, and that was the district court's fine. Does that mean, then, that Local 27 simply has no remedy because of Perry's limitation on damages? That's correct. In this case, what the board was doing in applying its longstanding precedent was nothing different than, I think my public counsel used the phrase, one of the no 10-K situations. There are often conflicting obligations. In fact, I point this court to its own precedent in the Gundle decision that we cite throughout our brief. In that case, the employer there entered into two different agreements and was accused in the Gundle case of voluntarily entering into two conflicting agreements, and the result, because of the result of the 10-K Congress determination, that that is what the board is here to do is that when there's a valid 10-K determination, as there was in this case, any litigation to get damages for the work that was assigned in the 10-K is something that cannot go forward. That's Gundle 2, right? That's correct. That's Judge Slaughter's opinion in Gundle 2. That's the Gundle 2, yes. How can we reconcile Gundle 2 with Gundle 1? Okay, well, Gundle 2... I remember reading something in the briefing that Gundle 2 effectively overruled Gundle 1. Was that your position or... Our position at this stage of the litigation, which is that it is a decision to enforce a board decision in order which came out on the merits, is that Gundle 2, which was in the same procedural posture that we are in, unlike Gundle 1, which was in a 10-L injunction context, that in Gundle 2, once the board, like it did here, decided there was an unfair labor practice, the lawsuits for damages could not go forward. So Gundle 2, we're in that situation here because we already, unlike in Gundle 1, have a board final decision on the merits. Gundle 1 clearly stated that if you're not trying to interrupt the workflow, if you're not seeking to enjoin, if it's just a garden variety damages action, then that can proceed. That's what Judge Garth wrote in Gundle 1. That's correct. And don't we have to follow that? Gundle 2 can't overrule Gundle 1 by virtue of our long-standing procedures. I agree, Your Honor. What we're arguing here is that Gundle 2 right now is distinguishable from Gundle 1 because right now we're in a situation. They're not in conflict. We're not at the preliminary injunction stage right now. We are at a decision point in Gundle 2. I agree with you. There's a procedural posture difference. And a standard of review. But how does that change our holding in Gundle 1 that a damages action that does not affect the work on the project, doesn't interrupt it, doesn't prevent the job from going forward, can be brought? How do you get around that holding? Because, Your Honor, in Gundle 1, that was being decided as to whether or not the lawsuit was and wasn't unlawful prior to the benefit, just like the district court judge here didn't have the benefit, of a board final decision in order, which is entitled to deference that a regional director's proceeding in a 10-L injunction is not. And so those statements, as the Gundle 2 court said, which were not binding on it because they were speculation in a proceeding that was in a completely different procedural posture with review of a completely different standard. We are not here now reviewing the district court's grant or non-grant of a preliminary injunction. We're reviewing the board's final decision in order, which the district court judge in this case, as well as in Gundle 1, did not have the benefit of before making that ruling. So our position is that Gundle 2, in this case, on the merits, is controlling, and that under the holding of Gundle 2, this case is like other post-10-K proceedings where lawsuits for damages are akin to the assignment of the work in which the board can find them for labor practices based on them. So under those standards, under the procedural posture that we're in right now, given that the board reasonably determined all of the jurisdictional prerequisites for holding a 10-K determination. So the second, besides the lack of a voluntary dispute mechanism, because there was no signing by the carpenters, there's at least reasonable minds and the board was reasonable in determining there wasn't something that could finally resolve this. There's this issue that continuously is raised by Local 27 about the collusion or the nefarious behavior of Donnelly, which I'd like to address. The first point that I'd like to make regarding... Does Curie help at all, or is that beside the point, in terms of distinguishing the 10-L from the 10-K under Gundle 1 and Gundle 2? Is it totally relevant to the analysis? Curie absolutely helps, Your Honor, in the sense that it's a Supreme Court decision of black-letter law with regard to what happens once there has been a valid 10-K determination and there is any lawsuit or, rather, any sort of action that is in conflict with it. That's what Curie stands for. What happened in Gundle 2, like many, the Ninth Circuit and various other courts, Ninth Circuit, I believe, in the Local 32 case, have found that continuing lawsuits for damages undermine the same reasoning that was used in Curie for having the preeminence, the prominence of a board Section 10-K determination. And so... It just seems like it's through the looking glass. I confess I wasn't a labor lawyer, but maybe you can help me with this. It sounds like the crux of your argument is... And I'm asking you to assume one important thing, which is assume for a minute that Donnelly just goofed up here and breached. So assume the breach. Is then the crux of your argument that it's an unfair labor practice for a union who has contractually enforceable rights against a company to get paid what they're due under that contract? Is that what the labor laws teach us? Is that your argument? Sure. That's what the Supreme Court and labor law do teach us because it's important to step back for a minute before going through the looking glass. Because to the lay person, I think whether it's the guy on the street or maybe even the general litigator who hasn't gone into the world of labor law, it sounds like you're saying that... You have no remedy. You're out. You have no right to get paid and you can just, you know, you might as well rip off that contract that you have. That's a... It just strikes me as a tall order. I don't know... I would say that that's not what the labor law and Supreme Court mandate because the 10-K process has railed on it. A slippery slope is one without rails. I learned that in law school. Well, maybe whoever told you that in law school didn't tell you what the heck he or she meant. Right. I mean, I would say that the rails that the 10-K proceeding provides is that there is shenanigans or funny business between an employer... I'm not even going there. I'm assuming Donley was acting in good faith. Let's forget any aspersions that Mr. Glenn might want to cast upon him. Let's say he's wrong. Why don't they have a right to get paid? Why don't they have a right to enforce their contract? And I understand why they don't have a right to get injunction and prevent this building from being built. That I understand. We want to make sure the work gets done. We don't want to live in a country where we can't go ahead and build things because people are going to have these fights. But as much as I understand that, I don't understand why they can't enforce their contract and get paid. I think the most succinct answer to your question is found in Gundle 2 when it stated that the valuable part of a right to a particular job is to be paid for it and that the distinction between doing the work and getting paid for the work is a distinction that is ephemeral. So that if it was allowed then for... There's always conflicting contractual obligations in the 10-K situation. That's why Congress decided the board is going to fill the void when there's no dispute mechanism and come in and make a determination. And if it was later allowed that one of those conflicting claims was able to give the money for the work to the other union, then the employer who utilized and followed the board's Section 10-K determination would essentially not be able to rely on the board's Section 10-K determination because it would eviscerate the entirety of the Section 10-K policy. So then the real crux of your argument is the labor laws allow a party to a contract to use the 10-K process to avoid its obligations under that clause. I would disagree with that, Your Honor, because in order to, as you say, use the 10-K process, this is what I meant about the rails on the 10-K process, there are three jurisdictional findings the board has to make before it will allow a 10-K proceeding to happen. And one of those is the voluntary dispute mechanism evidence, which was not present here. But the second one is whether there was a threat to take action that is against the statute. And here that is the threat to strike that the carpenters made. And what the board did do is examine whether that threat was actually a valid threat. And without evidence that it isn't, the board is going to take a look at a threat like that and is going to determine that it can go ahead and make the jurisdiction. But that doesn't really help. I asked Mr. Bellin about that. It seemed to me the board had to make that finding to have jurisdiction. But that doesn't really help resolve Judge Harper's question. It is kind of a mind-boggling, but it's a troubling result. Because the flip side of that is that the citizens of Eden Harbor would not be happy if they knew they had to pay twice for one job. Well, there's another party to this contract here, and that's Sandy. And there's a remedy against Sandy. Now, in this case, the district judge found damages had not been proven as caused by Sandy, by the general contractor. But the general contractor was found to be in breach of contract. And if damages from the general contractor's conduct could have been established, there would have been a remedy. And there are those cases, and that's what the board found here, that the lawsuit as regards Donnelly is the only unfair labor practice in this case because 10-K is limited to determining who gets the work. And a subcontractor directly assigns the work, and Donnelly here was a subcontractor, and thus interfering with Donnelly's assignment of the work with a later lawsuit for damages. You're saying that there would be a cause of action against Sandy, and that would not run afoul of Kerry and Grendel. I'm not sure whether or not there is a contractual basis for an allegation against Sandy. I just know that the Labor Relations Board specifically found in its decision that to the extent the lawsuit, it goes against Sandy, that is not an unfair labor practice. The unfair labor practice. If they sue, Local 27 sues Sandy, who do you think is going to be the first party that Sandy brings into that section as a third-party defendant? And with Donnelly. And the problem with that is the contract itself, the PLA, did not have joint and several liabilities. So there wasn't going to be liability over against Donnelly under those circumstances. And I do believe that whenever Donnelly as a subcontractor who had two conflicting obligations went to the board, the board took a lot of evidence, determined that it was a valid 10-K situation, and awarded the work to the Carpenters, once that was done, the board's decision as of December 31st, 2007, it entered any lawsuit for damages by the losing union, Local 27, under board law and the law of the circuit. Let me follow this through. If you have a joint and several issues, why wouldn't Donnelly be liable for its own breach? Because it signed a contract with Sandy when it was selected as the subcontractor and made certain representations which were not correct. So if there's any action back against Sandy, against Donnelly, based on Donnelly's own breach, not because of joint and several liabilities necessarily on the part of Donnelly, but Donnelly's own breach, doesn't it get to the same problem? Because the measure of damages there is going to be lost wages and you're backing the grundle proof. And I'm not sure the answer to that question, Your Honor. I can say in the facts of this case, the lawsuit that the board filed on lawful, that we're asking this court to have Local 27 withdraw, was in the second amended complaint asking for damages against Donnelly because of the arbitrator's award finding there was a breach of the PLA. And that's what the board ruled on here as directly conflicting with the Section 10K determination that the board reasonably made. And under Cary and under Grundle 2 and under a lot of the cases that we cited in our brief, it is black letter law that at that point, given these circumstances, a lawsuit for damages against a subcontractor is one that cannot stand. So for purposes of the board's decision in this case, with the lawsuit in this case, what we're asking you to enforce is the board's order having the particular lawsuit in this case to be withdrawn, such that it isn't going against the work and the damages that already Donnelly is being sued for. And the reason for this, the policy reason I just want to make clear, is absolutely so that the work gets done to address Judge Hardiman's concerns, but it's also for the rights of the employer to be able to follow and adhere to a board's Section 10K determination. So if the board's Section 10K determination is allowed to have various exceptions for PLAs, for example, given that, as Judge McKee asked, there are a lot of cases with project labor agreements versus collective bargaining agreements, and the board has found in those cases they're on equal footing, we would be eviscerating a great deal of what Congress wanted the board's 10K proceeding to do, which is to finally resolve these disputes. That just seems like a real, I don't know, undesirous end run. I mean, you're going to the feds to get around a state obligation, and I guess more power to you if you can get away with that, but it just doesn't seem right. You know, you sign on to a job knowingly that, you know, we're going to be subject to the strictures of this job, and then, you know, with a wink and a nod, don't worry about that, we'll just go see the feds and they'll bail us out and we won't have to comply. That's what it seems happened here. Is that not right? Well, that's different from the first assumption you were making about Donnelly acting in good faith because there's no evidence here of any wink or any nod between Donnelly and the Carpenters. No, no, that's a fair point, and I don't want to assume that Donnelly did that. What I'm afraid of is if we accept your position, we're opening the door, we're inviting every unscrupulous actor to pursue that very course because they can look at this case and say, well, it's no big deal, these PLAs aren't worth the paper they're written on, because as long as we're dealing with some sort of national labor agreement, you know, we get more pull with the NLRB and Washington, so, you know, this state PLA really isn't worth the paper. They're not generally going forward worth the paper they're written on. What I would take issue with what you said is that if there isn't a wink and a nod going on, which we're going to assume, then it is not within, truly, the employer's control to get the feds, to get the 10-K procedure to come out to its benefit. The employer can file a charge only if one of the unions takes an act, like threatens to picket, or some other act which is outside the control of the employer. Only then does the board go into a Section 10-K determination. Under Judge Hardman's scenario, the union is going to do that real fast, because that's going into it. That's the understanding as well. Go ahead and give me the worker that you have a problem with that threatened to picket you. Okay, I'm sorry. Given the scenario that Judge Hardman is asking you about, that's going to be the understanding going into it. The union will understand that they will threaten to picket up front if they don't get the work, and that way they're out from under the arbitration and they go to the 10-K procedure. The union may, once it finds out, as it did here, that there was a claim to the work by another union, decide to exercise that. I think that is correct, and that is why the board then has a very extensive hearing to determine exactly whether or not the threat by the union is a genuine one and is not a sham. And had the employer and the union be colluding, I think the phrase that is used throughout the brief, had that been the case, we may have a different situation as to whether the board should have exercised jurisdiction in the first instance under the 10-K proceeding. But, again, under the standard of review here, where the board considered all of this evidence and reasonably found that it had a valid basis to conduct the 10-K, once we get there, we're in the world of carry, we're in the world of dundle tour, a lawsuit for damages. In order to preserve that 10-K process is one that cannot go forward against the subcontractor who directly assigns the work. Could you please comment on the contention that the 10-K process is simply employer preference? Well, I know that there has been law review on other articles written. I'm not 100% familiar with them right now about how a lot of times it does turn out to be employer preference. There are five factors that the board does take into consideration. And I would point out as well, here, Local 27 never challenged the merits determination in this matter, ever, by the board in the Section 10-K determination. So, first of all, that's not even at issue in this particular case. But generally, there are five different considerations that the board looks to. I don't think in every single case, although I'm not sure it goes with employer preference, but certainly there are differing views as to the efficacy of how it has turned out. But in this particular case, that was never raised. The literature suggests that of the five factors, there's one that trumps all the others. Which is the employer preference. And the case law also indicates that employer preference and employers, 10-K awards that do turn on that, are still as enforceable as a 10-K award that would not turn on that factor. And that's because that's the way that labor law and the black letter law has gone. And so in this case, there's nothing other than, there's no direct record evidence, certainly, to indicate there was any sort of collusion or non-legitimate strike threat by the carpenters toward Donnelly, in order to start the 10-K proceeding that the board found. And, again, that analysis as to the merits was never challenged by the sheet metal workers in this case. Let me beat the same drum one more time in a different way. Because you've been very helpful in helping me work through these things. But let's assume that both unions acted in perfectly good faith. And let's assume that both of them were wronged. Because they were both promised something that the promisor could not deliver. Why wouldn't the board simply view the solution as, okay, the carpenters got the work. You had to make a choice. The board is then put in a difficult spot, right, under my assumption. Because the board has two unions seeking to do the work. Both have pretty good arguments. You can't, you know, tell half the carpenters to do the work and half the sheet metal workers. That, I think I know enough about labor law, would be a really bad idea. Probably not. Surprise fires pop up under construction. So you have to pick one. You pick the carpenters. Fine. Okay. Why isn't it the rational, logical, and just thing to do? You've let the carpenters have their bite. They get to do the work. They get to make the money. Why not also let the other aggrieved party have its bite rather than, you know, just making it an all or nothing game where one side is the complete winner and the other side is the complete loser? I would think because in that hard case that you're presenting, Congress did make the choice. And I think the choice that Congress made with the 10-K proceeding is that once the board decides who gets the work, and one of the factors the board considers as well is the collective bargaining agreement relationship. So that's something that comes into it along with the other factors. And that once the board has made that decision, that any allowance of lawsuits or damages or any actions that would continue to seek the work or payment for that. Well, forget work. I'm with you on the work. Just the money. Just the money would actually be directly undermining the employer's stability in borrowing that 10-K award. For example, if the employer had stopped, didn't happen here doing the work while the 10-K was going on, then the employer decided once the 10-K was issued, it would still be with that choice to who to give the work to. It gives the work to who the board said it did. But if it also knew that it could later be sued for damages, then it would still not have that stability in being able to follow the board decision in recognizing that the work and the pay for the work, which are essentially the same thing, need to be final and need to be for the purposes of labor stability Just the last piece of the puzzle. Why is it unstable? If I find that company that made the competing promises I can't keep to two entities, and the board tells me I have to give the work to the carpenters, and I know there's a risk that I'm going to have to pay money to the sheet metal workers, that doesn't cause me instability. That just makes me, you know, walk into my CFO's office and say, what the heck did you do here? You just cost the company $100,000 or whatever the amount of money is. Now, you know, we're going to have to pay on this job twice. Are you kidding me? That's crazy. Well, don't sign, you know, don't make two promises that you can't keep simultaneously. That's the lesson here. That's the just result, and that way we don't have companies doing this anymore, because what company in their right mind would want to pay twice on the same job? I would say that the point of federal labor law and the Kerry v. Westinghouse case and the point that Congress was making in the history of Section 10-K is to avoid even that scenario that you just described where you have to have an employer that is going to be going through a process where it is not certain to whom it should assign the work after a 10-K determination, either because of the fact it will be sued later for damages for the work or because it is still continuing forward with the work to one or the other of the unions. In order for 10-K to have any teeth, what Congress decided and what the circuits, including this circuit in Gundle 2, was that because the work is the same as the payment for the work, for purposes of the Kerry analysis, a lawsuit for damages, like in this case, cannot go forward and preserve the board's Section 10-K determination. And given here that the standard of review for both the board's unfair labor practice finding based on the 10-K and the 10-K itself is that the board made an arbitrary and capricious decision, I just don't think it can be said here that the board did that, given the precedent that is all over the place with regard to this in support, as well as the findings that the board made in the Section 10-K determination. And so we would urge that, again, the district court's decision and what the district court judge said, all of that was not, not only not binding on the board, but prior to the board actually taking a look at the ALJ's decision and deciding to affirm it with extremely reasoned analysis throughout the decision in order on all of these points. And so given that, we would submit that this court should enforce the board's determination. And I'm happy to answer any more questions if you do, but I see my time is up. If you have enough. That's a good time to figure out what your total loss was with all the rails. The slippery slope is the one that doesn't have any rails. You never go up and, had you spent any time in Syracuse, New York, you'd know that there's a lot of slippery slopes that have rails. The railings are there because it is a slippery slope. I went to law school in Illinois. It's pretty snowy there, but. It's so flat. They're not worried about going down there. No, they're not. Well, thank you. Thank you. A few points. Number one, just not to keep kicking the horse, but on the voluntary dispute mechanism, not giving the board 10-K jurisdiction. We briefed the equitable estoppel argument. I'm sure the court's reviewed it. It's in our brief at page 30. Relying on Third Circuit decision in DePont, in Amores, in Rome, Poulenc, Fiverr, where we think there is support for the notion that merely not signing an agreement but getting all the benefits of the agreement, the party is equitably estopped from saying we don't have any burdens. Is that the equitable estoppel argument? There was a judicial estoppel argument there, too, and you started out with judicial estoppel and then you went to equitable estoppel, but they're two different things. You're arguing both, I think. I think we briefed both, but what I'm referencing is the equitable estoppel argument, the conduct either expressed or implied reasonably misleads another to his prejudice that a repudiation of such conduct would be unjust, and we cite the cases there. The second thing that I think I want to focus on is the 10-K process, just in terms of the timing of how this process works. Now, I'm a labor law litigator. I've tried 10-K cases. In our world, we all know it's employer preference. I think if we take a look at, and we cited some of the studies in our briefs, it's employer preference. It's a number of factors, and the Labor Board will go through that analysis, but if an employer decides they want Union A over Union B, it is a foregone conclusion they're going to get the work. In terms of the timing of the Labor Board process, this project occurred in 07. Charges were filed, I think, at the end of April, beginning of May. The 10-K hearing happened in July. Remember, we were there July 4th. The decision on the 10-K wasn't until the end of that year, December 31st, last day of the year, the work was done. How meaningful is that decision? It really just ends up serving as absolution for, in this case, Donnelly, absolution for an employer that, Local 27, who really is on the side of the angels, not having picketed, not threatened to picket, not taking any action while their competing labor organization is doing the work, even though we have an arbitration decision saying it's our work, that was issued very quickly in an expedited fashion, as called for under the Project Labor Agreement statute and the Project Labor Agreement. Local 27 doesn't do anything. Sits by, carpenters do the work, work gets done, and then, finally, the Labor Board weighs in on this 10-K process. Is there any mechanism built into the rules of the NLRB to request? I know there were some issues about membership of the NLRB at the time, but I guess that doesn't impact the decision here. Is there any way that you could have asked for some kind of expedited resolution? Not that I'm aware of, and if we had, I just don't think we would have that. I know what you're saying. I don't think we would have that control. Isn't Ms. Beard's argument, though, that if there's a risk that these 10-K decisions are not the end of the matter and that there can be satellite litigation for damages, that the party, like O'Donnelly, like Asambi, there will be all kinds of labor disruption because they're not going to be sure to whom to give the work because of the lack of prediction. I understand that, and we're not here to say there's not some value to the 10-K process. I think it's not the best process, but there's some value to that kind of labor stability in what we would term kind of a garden variety kind of context where it's not uncommon where you have a contractor that has collective bargaining agreements, AEDF agreements with multiple trades that generally do different work, and there can be times when there's that overlap where kind of unintentionally end up in that situation. And sure, there should be a 10-K process, and I understand the need to give the contractor some sense of stability that there's not going to be a problem. We just have a completely different scenario here that we're urging the court to take a look at. Again, a project labor agreement environment where you have one contract governing the whole project with a supremacy clause governed under state law where there are just different considerations. There's an expedited arbitration process within that project labor agreement where you have a decision within a month of a grievance being filed or a jurisdictional dispute coming up, not six months later. And our view, Your Honor, is that's fundamentally different from the garden variety 10-K case. I think what you're really asking for in a lot of your argument is policy, policy of necessity. But it seems to me that that argument is best directed to Congress, and Frey came down to the point where we still had a function in Congress back in the 60s. We had the ADA, the EPA, Voting Rights Act, Civil Rights Act. They were really making decision stuff. They were doing all of it. They didn't do anything to overrule Kerry back in a time when you had a functioning body that could have overruled it had they thought that was wrong. You're right. It hasn't happened. But Kerry predates the project labor agreement statute, predates Boston Harbor, where the Supreme Court very clearly carved out from labor board primary jurisdiction preemption analysis in the area for project labor agreements. Was Boston Harbor a 10-L or a 10-J? It wasn't a 10-K. It was other considerations. But they analyzed whether or not a public entity entering into or having bid specifications for a project labor agreement would be preempted under the National Labor Relations Act. But what it allowed was municipalities to indeed enter into project labor agreements. And, you know, the world has changed since Kerry, I guess is what I'm suggesting. And it's particularly changed, you know, when you have a state like New Jersey that has now authored a project labor agreement statute. And you have these. I'm not sure we're the entity that can respond to that change. If it were our Congress, then at least we'd have to send them in to be the Supremes. I'm not sure we have as much leeway to respond to the kind of policy argument that you might like. Yeah, no, and I understand. And, again, you know, we're not trying to supplant the board's 10-K process. It is what it is. And whether it works or it doesn't, we can debate that all day long. Our view is you have a different factual scenario here. You have a different regulatory scenario here with project labor agreements. You have different commitments on a factual basis here than you do in other cases. And I think Gundel 1 points that out, that. Is Gundel 1 inconsistent with Kerry? I don't think so. I mean, Kerry's kind of a sweeping, you know, kind of a sweeping conclusion that, you know, anything after 10-K is inappropriate. Whereas Gundel 1 says, look, if you're not seeking reassignment of the work and it's just a garden variety damage claim of breach of contract, it's permissible. And the 10-K absolution wasn't meant to protect a contractor who says, you know what, I'm paying too much in labor rates with this union. I'm going to go shop a better deal. That's making a business decision. And if you have to pay twice, if a contractor has to pay twice making that business decision, that's what business is about. I don't think Gundel 2 overrules Gundel 1. I think they need to be read together. I think they can be squared. They're consistent. You think they are consistent? I thought you were going to argue that Gundel 1 is inconsistent with 2 and 1 stands under our internal operating procedures. We argued that in a briefing. Why do you think they're consistent? Well, I don't think Gundel 2, I misstated, Gundel 2 does not overrule Gundel 1. And I think we argued that in the brief. And the district court, and we included this in our brief, analyzed this case under Gundel 1, saying that the court allowed a non, when the request is not for a reassignment of the work, but a claim for damages, there wasn't a bar from the 10-K. How do you respond to Ms. Beard's argument that Gundel 2 is not contrary to Gundel 1 because of the different procedural postures in those cases? It wasn't. I mean, there's a 10-L and a case on the merits, but I think the observations and the conclusions in Gundel 1 remain. And those are the factors that I've indicated, that if you have a union that's not seeking a reassignment of the work, which Local 27 did not at any time after the 10-K hearing, and it's a claim for damages, those principles survive regardless of the procedural posture, whether it's a 10-L preliminary injunction process or a petition for review and enforcement. Okay. Thank you very much. Very helpful argument. Let me take a brief break and we'll then proceed to the.